UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TAMECKA WALKER,

               Petitioner,

      v.

RON DAVIS, WARDEN,

               Respondent.

No.  2:12-cv-01882 GGH

ORDER[1]

_Introduction and Summary_

      Petitioner, a foster mother at the time of her foster child's death,  was convicted of causing great bodily injury to a child under 8 years old causing death, Cal. Penal Code 273ab[2] and second degree murder, Cal. Penal Code 187(a).  She was sentenced to 25 years to life on the first charge and 15 years to life on the second.

      Petitioner raises two issues: (a) that irrelevant, inflammatory photographs of the child's condition after death created a fundamentally unfair trial; and that (b) her confession was unduly

---

[1] The parties have consented to the undersigned as the presiding judge pursuant to 28 U.S.C. section 636 (c).

[2] Subsequent to petitioner's conviction, section 273ab was split into two subsections (a) and (b). In looking at today's statute, petitioner would have been convicted of causing great bodily injury resulting in the death of a child under 8, section 273ab (a).

1

coerced.  Although the photographs issue would be a close call on *de novo* review, for the reasons that follow, in the AEDPA context of this case, the petition must be denied.

*Facts*

The following facts are taken from the opinion of the California Court of Appeal, and are useful background to the issues in this case.

> The child victim was born on April 23, 2006. She tested positive for cocaine at birth, and Child Protective Services (CPS) placed her in protective custody. The child lived in six different homes between April 2006 and September 2007. Her last foster placement was with defendant, who had two additional foster children, and provided day care for other children.
>
> The child had diaper rash and a history of mild asthma. Defendant was given creams to treat the rash but nothing for the asthma.
>
> Janna Thoftne, a social worker for CPS, visited defendant's home on October 17, 2007. Defendant told her she used the cream and the diaper rash cleared up after two weeks. Thoftne observed that the child alternated between nonresponsiveness and inconsolable crying. Defendant said the child would stop crying when picked up but her day care responsibilities prevented defendant from carrying her all the time. She had thought about returning the child.
>
> Shirley Jackson sent her two sons to defendant for day care. Defendant told Jackson that the child victim had a bad diaper rash, and she had to constantly change her diapers. She said it was probably not a good idea to keep her in light of her crying and that she had told CPS to take the child back.
>
> Sierra Cotton used defendant's babysitting services for her son. Defendant told her the child victim was more distant than the other children and did a lot of crying. Defendant said she called CPS to get help because the child was always crying. She also told Cotton that the child had some kind of skin rash.
>
> Sacramento Police Officer Sean Cunningham was dispatched to defendant's home on October 22, 2007.  When he arrived at 6:27 a.m., firefighters were administering CPR to the child. Defendant said she woke up at 6:15 a.m. and found her lying face down in the crib. She would not wake up and her fingernails were purple, so defendant called 911.
>
> /////

2

Thoftne received a voice mail from defendant on October 22, 2007. Defendant was crying hysterically and said something happened to Tamaihya, who was being taken to the hospital. Thoftne called defendant around 10:15 a.m. Defendant told her that she called 911 after checking on Tamaihya, who was warm, but had purple fingernails.

Sacramento Police Officer Tracy Joseph also responded to the dispatch call. Defendant was on the phone leaving a message; she appeared to be making faces, as if she was forcing herself to cry. Her demeanor became normal when she talked to Officer Joseph.

Officer Joseph learned that defendant had three foster children: every night she would set out clothing for the children to wear the following day. Officer Joseph noticed clothing was set out only for the two other foster children.

Defendant told Officer Joseph that she found the child unresponsive, face down in her crib. She shook the child, turned her over, and saw that her fingertips were purple and she had dark-colored lips. Defendant then administered CPR to the baby. She rarely made eye contact with Officer Joseph during their conversation.

The child was pronounced dead at the emergency room that morning. The pathologist did not know exactly how she died but was of the opinion that the cause of her death was "Probable asphyxia by smothering." She died at least three hours before the emergency workers saw her at 6:30 a.m.

According to the pathologist, a child like the victim could be smothered by placing a hand over her mouth and nose; bruising about her face led him to believe she was smothered. It would take three to five minutes to asphyxiate a child in this manner. The child also sustained numerous bruises about her face, head, and abdomen-injuries which were not consistent with an accident.
[Facts relating to the interviews are given in the appropriate section.]

People v. Walker, 2011 WL 302852 *1-2 (Cal. App. 2011)

*Discussion*

AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

Accordingly, "a habeas court must determine what arguments or theories supported or … could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was

4

1   unreasonable requires considering the rule's specificity.  The more general the rule, the more

2   leeway courts have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the

3   stringency of this standard, which "stops short of imposing a complete bar of federal court

4   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

5   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

6   was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

7          The undersigned also finds that the same deference is paid to the factual determinations of

8   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

9   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

10   decision that was based on an unreasonable determination of the facts in light of the evidence

11   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

12   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

13   factual error must be so apparent that "fairminded jurists" examining the same record could not

14   abide by the state court factual determination.  A petitioner must show clearly and convincingly

15   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

16   969, 974 (2006).

17          The habeas corpus petitioner bears the burden of demonstrating the objectively

18   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

19   Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

20   show that the state court's ruling on the claim being presented in federal court was so lacking in

21   justification that there was an error well understood and comprehended in existing law beyond

22   any possibility for fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  "Clearly

23   established" law is law that has been "squarely addressed" by the United States Supreme Court.

24   Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008).  Thus, extrapolations of

25   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

26   Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state

27   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

28   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

1  established law when spectators' conduct is the alleged cause of bias injection).  The established

2  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

3  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

4  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

5       When a state court decision on a petitioner's claims rejects some claims but does not

6  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

7  the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S. ___, 133 S. Ct.

8  1088, 1091 (2013).

9       The state courts need not have cited to federal authority, or even have indicated awareness

10  of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S. Ct. at 365.

11  Where the state courts have not addressed the constitutional issue in dispute in any reasoned

12  opinion, the federal court will independently review the record in adjudication of that issue.

13  "Independent review of the record is not de novo review of the constitutional issue, but rather, the

14  only method by which we can determine whether a silent state court decision is objectively

15  unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

16       Finally, if the state courts have not adjudicated the merits of the federal issue, no

17  AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

18  Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

19       A.  AEDPA Precludes Challenge to the Photographs

20       During the trial, the prosecution introduced a number of photographs, the ones at issue

21  involving the post-mortem depiction of the victim's body in the diaper area.  At the time the

22  pictures were taken, the skin in this area had macerated as a result of post-mortem reactions of the

23  skin with moisture.  As related by the Court of Appeal:

24

25       According to the pathologist's testimony, his autopsy showed the child had
         an injury to the skin resulting from prolonged exposure to urine, leading to a

26       "postmortem burn, or a postmortem diaper rash." He described the rash as "areas
         where the skin had been basically sloughed off, exposing the underlying dermis. It

27       was reddened, but appeared to mostly be injury to skin after death because of the

28

6

contact with moisture and urine, which is ... a chemical irritant." The pathologist stated the child may have had a minor rash obscured by this injury, but it did not "appear that she had a significant antemortem diaper rash."

People v. Walker at *3.

The Court of Appeal found two reasons for approving the  admission of the post-mortem photographs of the diaper rash area, even though the photographs showed much more than a mere diaper rash.  First, the appellate court found that the photographs were relevant to show that the child had not been properly cared for insofar as the skin condition could suggest a persistent diaper rash, and hence, this condition would show that the foster mother was more likely to abuse her ward because the persistent rash would have caused continuous crying thereby giving petitioner a motive for killing the child.  As set forth in petitioner's briefing, this rationale is questionable in that a diaper rash on an infant is not uncommon, and the court gave no indication how one was to decipher a persistent rash from one that had been of more recent occurrence.[3] Indeed, even the appellate court referenced the only forensic expert's testimony that the evidence simply disclosed a possible, mild antemortem rash.  Furthermore, all who knew the child before death, including petitioner, freely admitted that the child cried continuously.  The pictures were clearly unnecessary to show this fact, and not very probative of the fact in the first place.  More importantly, the jury was not viewing a diaper rash; it was viewing an ugly macerated skin condition caused by moisture and the passage of time after death.  Perhaps the jury could disregard the photographs when told by the only expert that the condition resulted from post-mortem reactions, but this begs the issue—why show the photographs at all if they do not purport to show a serious antemortem, peristsent diaper rash?

The second reason for showing the photographs was to confirm the expert's testimony concerning the time of death in that the time of death conflicted with petitioner's *initial* statements to the police as to when she last saw the child "warm."  But there was plenty of other

---

[3] Moreover, the evidence is undisputed that the deceased child had come to petitioner's home with a history of diaper rash.  The fact that petitioner did not "cure" this problem does not demonstrate abuse.  One could go further and find that petitioner actually did help with the rash issue in that the state's own expert could only testify to a possible *mild* rash at death.

1   objective evidence establishing the time of death, and the need to show the arguably ugly skin

2   condition was unnecessary especially in light of the visual prejudice which could be caused by the

3   pictures.  Moreover, petitioner later told the police in the very same interviews that she

4   discovered the child dead sometime close to midnight, panicked, and failed to call 911 for several

5   hours.  Thus, petitioner's ultimate statements on the issue of time of death were actually in

6   accordance with the expert's opinion.  To the extent that the prosecutor desired to highlight the

7   inconsistencies in petitioner's statements, the conflict in the statements were clear from the

8   interviews themselves, and the pictures were not at all necessary on the point.

9       However, there is no need to finally determine whether admission of the photographs was

10  due process error and whether such error was prejudicial.[4]  All the above being said, and even

11  assuming that on *de novo* review one would find the admission of the photographs violative of

12  due process, including within a concomitant prejudice finding, one must find the state appellate

13  court AEDPA unreasonable in order for the habeas writ to be granted.  Even if one went further

14  with the merits review and could find the state appellate court unreasonable in an AEDPA sense,

15  the *sine qua non* threshold of AEDPA error is that the Supreme Court has clearly established the

16  law which allows AEDPA "unreasonable" review on the merits in the first instance.

17      The Ninth Circuit has held, and it remains the law today, that the Supreme Court has not

18  clearly established that admission of prejudicial evidence violates the Constitution.

19

20      Under AEDPA, even clearly erroneous admissions of evidence that render a trial
        fundamentally unfair may not permit the grant of federal habeas corpus relief if not
21      forbidden by "clearly established Federal law," as laid out by the Supreme Court.
        28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately
22      addressed a claim, this court cannot use its own precedent to find a state court
        ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.
23

24      /////

25

        _____

26  [4] For reasons that are unclear, the parties did not supply the photographs at issue to the court, and
    the undersigned would have certainly ordered them produced if an ultimate finding on due
27  process/prejudice was necessary.  An order of production did not issue because, as demonstrated
    in the text, no cognizable claim can be made in any event due to AEDPA constraints no matter
28  how horrible the pictures may be.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ on the basis of Holley's additional claims.FN2

> FN2. We note that, in spite of the lack of Supreme Court precedent on the issue, the trial court's admission of the pornographic materials resulted in a trial that was fundamentally unfair and would warrant issuance of the writ under this court's precedent. See People of the Territory of Guam v. Shymanovitz, 157 F.3d 1154, 1158-59 (9th Cir.1998) (holding that the trial court erred in admitting evidence that the defendant kept sexually explicit gay adult magazines in his home, since that fact was irrelevant to the factual question of whether the defendant had physically and sexually abused a group of children under his supervision); McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir.1993) (admission of evidence that defendant owned a knife collection was erroneous when there was no link between the collection and the crime). But see United States v. Curtin, 489 F.3d 935, 950-51 (9th Cir.2007) (en banc) (evidence that the defendant was carrying stories about illicit relationships between older men and girls was relevant to the allegations against him that he intended to engage in a sexual act with a minor).

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  See also Garza v. Yates, 472 Fed. Appx. 690, 691 (9th Cir. 2012).

Holley remains the AEDPA law of the Ninth Circuit.  There is no point in analyzing the "reasonableness" of the Court of Appeal analysis because the threshold "clearly established law as held by the Supreme Court" has not been satisfied.  The undersigned therefore turns to the next issue.

B.  The Involuntary Confession Issue

Petitioner argues that the criminal justice system naiveté of her client, when juxtaposed with the skill and persistence the interrogators utilized in questioning over a three day period,

made for a due process violation, i.e., an involuntary number of damaging admissions.

The undersigned has reviewed the statements in their entirety and the video of the statements as well.[5]  The Court of Appeal recounted the facts accurately, and that recounting, set forth below, is entitled to a presumption of correctness.  Murdaugh v. Ryan, 724 F,3d 1104, 1106 (n. 1) (9th Cir. 2013).  There are, however, a few supplemental observations of the undersigned included afterwards.

> Defendant talked to the police six times between October 22, 2007, and her arrest on October 24. She briefly spoke to Officer Cunningham at her home around 6:30 a.m. on October 22. She was interviewed by Officer Joseph moments later. Detective Henry Jason interviewed her around 10:24 a.m. Later that day, Detective Jason interviewed her at the police station for a few hours.
>
> At Detective Jason's request, defendant returned to the police station around 3:13 p.m. on October 23, 2007, where she was interviewed for about five hours, and also participated in a polygraph examination conducted by Sacramento Police Detective Mark Tyndale. After the test, Detective Tyndale told defendant that he had trouble with her response regarding whether she intentionally did something to the child. Toward the end of the interview, defendant told Detective Tyndale that she had wrapped the child too tightly in a sheet and blanket.
>
> Defendant's last interview took place on October 24, 2007. Detective Jason administered a Miranda [footnote citation omitted] warning, and defendant waived her rights. At the end of the interview, defendant stated she held her hand over the child's mouth until she stopped crying.
>
> ****
>
> Defendant's argument centers on representations from the detectives during the interviews on October 23 and 24. On October 23, Detective Tyndale informed defendant that she failed the polygraph examination, and he was having a hard time with whether she intentionally caused the child's death. He told her that people would forgive a mistake, but if someone made a mistake and was not

---

[5] The October 22, 2007 CD could not be reviewed on the undersigned's computer.  However, the remainder of the CDs were viewable.  The CDs were actual exhibits used in court and do not comprise the totality of the interviews.  Indeed, none of Detective Tyndale's (more aggressive) interview (CT 901-917) is contained on the videos.  The CT contains the interviews in their entirety as far as the undersigned can determine, but that determination is difficult in that the interviews are interspersed in the Clerk's record and are at times, duplicative.

honest about it, "people aren't as forgiving." He also said: "I don't think you're someone who would intentionally kill a child.... [¶] ... [¶] But if there was something that happened that was an accident, ... [¶] ... [¶] that's what you need to tell me. 'Cause otherwise the detective[']s gonna think you did do something on purpose."

Later, Detective Tyndale told defendant he would like to design a polygraph test she could pass, and he would have to explain to Detective Jason why she did not pass the polygraph. Detective Tyndale repeatedly asked defendant if the child's death was an accident, and continued: "When you tell me what it was, that's how I'm gonna design the polygraph test.... [¶] ... [¶] Because if it's an accident, that's what people understand. Especially when you're sorry for it. When you don't tell the truth, people don't believe you're sorry."

Detective Tyndale continued this line of questioning, assuring defendant he believed the killing was accidental, and telling her: "if you tell me the truth, I promise you're gonna pass the test. If it was an accident, I can show that. But you gotta be honest with me about it." He repeatedly promised defendant that if she told the truth, he would develop a test she could pass. He also told defendant, "You know, what kind of person would kill a small child on purpose? Are you that kind of person?"

Detective Tyndale then told defendant he knew she was "worried" and "scared" as some day "12 people sitting in a jury" would be looking at her, wondering whether she did it on purpose or it was an accident. He reiterated that it would be important for him to "walk out of here and be able to go up to Detective Jason and say, she's telling me the truth? She did it, but she didn't do it on purpose. It was an accident." As the interview wound down, he told defendant she took on more children than she could handle, and "I can help you show that it was an accident." By the end of the interview, defendant admitted she accidentally killed the child.

The following day, Detective Jason asked defendant if she had put her hand on the child's mouth to stop her from breathing. Defendant said "No," and Detective Jason replied that defendant had come a long way since the previous interview, and "you know, getting this off your chest. You got to be feeling better about that."

Detective Jason told defendant he understood that defendant knew how to take care of a child. Detective Jason told defendant she "had to have done something." He reiterated several times that he thought it was an accident. Later, Detective Jason asked defendant if she put her hand over the child's mouth. After she gave an

1   inaudible response, Detective Jason told defendant she was not being honest with
2   him, and she would feel better if she told the truth. After equivocating on whether
    she had put her hand over the child's mouth, defendant admitted doing so, and
3   stated that she kept her hand over the child's mouth until she stopped crying.

4

5   People v. Walker, at *4-5.[6]

6          The Court of Appeal opinion, accurate as it is, nevertheless does not reflect the

7   persistency of the questioning.  The first two days of the interviews by Detective Jason were

8   plodding, polite and persistent.   Petitioner was asked again and again to describe the

9   circumstances which led to the infant's death.  The tireless questioning led to petitioner being

10  caught in inconsistencies/absurdities, e.g., she administered CPR at the time when she found the

11  infant dead in the middle of the night, and later, after she "panicked," several hours later, when

12  she repeated  CPR on a known lifeless body in the process of a conversation with a 911

13  dispatcher.  After a polygraph was administered on October 23, Detective Tyndale attempted to

14  force the issue.  This interview on October 23, and that of detective Jason on October 24, 2007,

15  was of a more aggressive character, although at all times, the interrogation was civil.  In the latter

16  interviews, if the police detectives told petitioner she was not telling the truth regarding the

17  causation of the death once, they told her 100 times.  The detectives were not going to accept any

18  answer by petitioner that she did not take the actions which led to the death.  Similarly, the

19  numerous statements to petitioner stressing the different possible outcomes depending on whether

20  "it was an accident" or "purposeful," was a red herring in that Cal. Penal Code 273ab only

21  required purposeful actions of petitioner in causing injury, which resulted in death.  The

22  prosecution would not have to prove that petitioner intended the death of the infant by her actions.

23  And, the police knew at the time that the injuries to the infant were incompatible with an accident.

24  Many times petitioner was coaxed to be honest, and that the truth would make her feel better.

25  She was in fact told on occasion that she was being honest, but the questioning continued with the

26  clear indication that she was not.  She was also confronted numerous times with the alleged

27

28  [6] The very initial police interviews were short, apparently not recorded, and it is not possible to
    assess them in the totality of the circumstances regarding the ultimate admissions.

falsity of her polygraph exam, often coupled with the "accident-purposeful" dichotomy, i.e., people would understand if the death was an accident.

As Justice Frankfurter recognized over sixty years ago:

A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is over-borne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here transpired to deny that this was a calculated endeavor to secure a confession through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right ....

Watts v. Indiana, 338 U.S. 49, 53–54, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949).

In determining the voluntariness of a confession, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (citation and internal quotation marks omitted). "The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Id. (citations and internal quotation marks omitted). It is not sufficient for a court to consider the circumstances in isolation. Instead, "all the circumstances attendant upon the confession must be taken into account." Reck v. Pate, 367 U.S. 433, 440, 81 S. Ct. 1541, 6 L.Ed.2d 948 (1961) (citations omitted).

The Supreme Court has observed that, "[t]he application of these principles involves close scrutiny of the facts of individual cases." Gallegos v. Colorado, 370 U.S. 49, 52, 82 S. Ct. 1209, 8 L.Ed.2d 325 (1962) (emphasis added). "The length of the questioning, the use of fear to break a suspect, [and] the youth of the accused are illustrative of the circumstances on which cases of this kind turn." Id. (citations omitted). An additional relevant factor is "the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." Withrow, 507 U.S. at 693–94, 113 S.Ct. 1745(citations omitted). Thus, we ask: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be

used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Schneckloth v. Bustamonte, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (citation omitted).

The fact that Doody was a juvenile is of critical importance in determining the voluntariness of his confession. The Supreme Court "has emphasized that admissions and confessions of juveniles require special caution." In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

Doody v. Ryan, 649 F.3d 986, 1007-1008 (9th Cir. 2011).[7]

Although lengthy, the undersigned has chosen to highlight the Doody recitation of its interview in that it provides useful comparisons to the allegations here, and it was a recent exposition by the Ninth Circuit on established Supreme Court authority on the subject of involuntary confessions.[8]

> [the interrogation in Doody lasted about 13 hours overnight-- from (9:30 p.m. to approximately 10:30 a.m.]

> The interrogation commenced with casual questions from both Detective Riley and Detective Munley about Doody's roommates and friends, including whether any of them owned guns. Doody volunteered that his friend Caratachea owned a gun, but denied that he ever borrowed or shot the gun. The two detectives then switched the focus of the questions to the temple murders, asking Doody to detail his whereabouts at the time of the murders and to describe how he became aware of the crime. Doody responded that on the night of the murders, he went to a movie with a friend and returned home. The two officers followed up by asking additional questions about the temple, Doody's prior visits to the temple and the victims.

> Approximately one hour into the interrogation, Detective Riley paused to lecture Doody about the importance of telling the truth. He also asked a pointed question: whether Doody or anyone Doody knew had ever borrowed Caratachea's rifle. Doody denied that he had, but stated that Garcia might have done so. At that point,

---

[7] Doody has a lengthy history.  The initial case was Doody v.Schriro, 548 F.3d 847 (9th Cir. 2008), rehearing granted 566 F.3d 899 (9th Cir. 2009), and on en banc review, 596 F.3d 620 (9th Cir 2010 en banc), cert. granted and vacated Ryan v. Doody, 131 S.Ct. 456 (2010), after remand Doody v. Ryan, 649 F.3d 986 (9th Cir. 2011), cert. denied Ryan v. Doody, 132 S.Ct. 414 (2011).

[8] The undersigned does not focus on the specific analysis of the Court of Appeal herein as it, for the most part, was distinguishing a California case which had found an involuntary confession, which was raised by petitioner and was the point of petitioner's argument in the state court.

Detective Riley apprised Doody that there were some things about the gun that he knew Doody was aware of, and he urged Doody to come clean.

Detective Riley again asked Doody about his whereabouts when the murders occurred and whether he knew anything about the murders other than what was reported in the news. When Doody once more denied any knowledge of the murders, Detective Riley repeated his warning about the importance of Doody telling all, and he informed Doody that the detectives knew Doody was lying when he denied borrowing Caratachea's rifle. In response, Doody reiterated that he never borrowed the rifle, but Garcia might have.

Following Doody's repeated negative response to the question of borrowing Caratachea's rifle, both detectives proceeded to lecture Doody on the importance of his telling the truth. In the midst of the lecture, the two detectives confronted Doody with their "knowledge" that Doody and at least one other person borrowed the rifle. They demanded information confirming their knowledge, telling Doody that "its [sic] so important for you, for you to tell us. I mean you have to tell us. You have to." Doody Interrogation Transcript, Tape 3, p. 27 (emphasis added).

Almost immediately after the two detectives told Doody he had to tell them about borrowing the rifle, Doody obliged. He told the two detectives that he and Garcia borrowed the rifle well before the temple murders. This admission prompted several more sternly couched lectures on the importance of telling the truth, and the detectives' knowledge that Doody was lying. The detectives also increased the pressure on Doody by informing him that Caratachea's rifle was the murder weapon. Nevertheless, Doody maintained that he returned the rifle to Caratachea prior to the murders. He continued to deny knowledge of, or involvement in, the murders in the face of repeated questions and accusations that he was withholding information from the detectives.

In the middle of the night, Doody became virtually non-responsive to the detectives' questioning, even though a third detective, Detective Sinsabaugh, who had interviewed Doody in September, joined the tag team. From that point, the pressure intensified. Detective Riley began with:

Why if you didn't kill anybody, then what is what is keeping you from making people understandable [sic] believe that. 'Cause if you didn't kill anybody, doing what you're doing right now isn't going to convince anybody ... They're gonna say and this is only speaking it out common sense fashion how people normally perceive things, is it if you didn't kill anybody why is he lying, why won't he tell what happened, there is [sic] got to be a reason for that; and the reason that most people would come to is that you probably kill [sic] them and it is won't admit it. So we can get pass [sic] that point and deal with the fact that he didn't kill anybody, but this is why your problem in coming across with what he knew and reasons were this and this and hey! I think there [sic] a probably pretty good reasons [sic] otherwise you wouldn't have such a problem Jonathan, but

help us understand that, and by understanding it you're going to help yourself out tremendously 'cause we have to know. Com'mon!

Doody Interrogation Transcript, Tape # 8, pp. 1–2. Doody responded, "I don't know anything else." Id. at p. 2.

Detective Sinsabaugh chimed in: "You know me don't you Jonathan? How'ya doing my friend?" Id. at p. 6. The detective instructed an unresponsive Doody:

Remember we talked about honor. I need your help on this one. I know what's up. I need you to help on this one, okay? You got a duty to help us Jonathan; I know exactly what went down, my man, and you got a duty to help us and we can work this thing out together and I'm coming to you straight up Jonathan. I'm serious. These guys [the other two detectives] are trying to give you an opportunity Jonathan for you to help us to be on our team and that's why they're spending this time with you. Just like that night I talked to you, it's no game now Jonathan. I know you though Jonathan, I know ... your family. I know where you have been raised, and I don't think Jonathan Doody is a cold blooded killer. These guys were cowards Jonathan. You got mixed up with some dumb punks, and you gotta help us on this Jonathan. You gotta help us on this 'cause it's no game now. I mean that you gotta help us on this. This is not a game; I'm not playing with you Jonathan. I know your family and everything. Please help me on this Jonathan. We can we can talk and we'd see how we can ever work this thing out, but you gotta be straight up front with me. If if you lie to us Jonathan, then we're not gonna be able to believe the truth. If you lie to us, I'm not gonna be able to believe whether or not you are [sic] killer and I don't believe that Jonathan and that's why I took the time to come in and talk to you, 'cause I care about you man. Let it out, Jonathan. Now is the time let it out. Let it out, Jonathan. Tell's [sic] us what's up; take some pride in yourself we'll, we'll work it out Jonathan, but it's not gonna help leaving it in. I need to know your part; we already know what went down Jonathan. Help me on this one.

Id. at pp. 6–7 (emphases added).

Besides reiterating that he didn't do anything, Doody was non-responsive. The three detectives continued in tandem:

Detective Munley: Tell us what happened. We gotta hear it from you. Get it all cleared up Jonathan, you can do it. It has to come out Jonathan.

Detective Sinsabaugh: Jonathan now is the time.

Detective Munley: Go ahead Jonathan please. You're not afraid to take stands, just get it out, just get it out ...

Detective Munley: Do it Jonathan; I can help you. Let it out Jonathan.

Detective Sinsabaugh: Trust me on this one. Jonathan. Whose plan

16

was it Jonathan? Tell me Jonathan, whose plan was it? I'll work with you on it. Go ahead, Jonathan, go ahead. Help us on this.

Detective Riley: Jon you can do it. Whose idea was it?

Detective Sinsabaugh: Jonathan let it out, let it out take a deep breath let it out now. Let it out and tell us what happened.

. . . . .

Now is the time, let it out. Get it out of you, it's a new beginning for you.

. . . . .

Jon, this is bull shit. Get it out Jonathan 'cause then I'm not gonna believe you when you do tell us we, we know what's up. Now let it out now, and we'll work together on it.

Detective Munley: Jonathan, who are we talking about here? You gotta take this position now. You better take a hold of this now.

Detective Riley: This is your time, Jon. This is your opportunity get [sic] it out.

Detective Sinsabaugh: Jonathan, I know you're involved. I don't wanna go out that door; I don't wanna believe other one's, other people's story. I want it from you first hand. Jonathan, it's time. I'm serious, it's time.

. . . . .

Take a stand. Be a man ...

Detective Riley: You have to ...

. . . . .

Detective Sinsabaugh: Now come clean with me Jonathan; come clean.

. . . . .

 Detective Munley: Rollie was involved, wasn't he?

Detective Riley: Com'mon Jonathan, it's not that difficult. Either he was or he wasn't. Was he? Was he or wasn't he involved? Jonathan was he?

Doody: I don't know.

Detective Riley: Yes, you do know. Was he? Detective Sinsabaugh: Jonathan, I'm going out this room. I'm gonna talk to other people. I thought for surely [sic] I could come to you; you're not thinking in your interest Jonathan. How we talked about the honor; I don't see

17

1    any of that honor my man.

2    Detective Riley: Try, you can do it. Gotta get it, you gotta release it
     Jonathan. It's not gonna go away. Man you gotta get it out. Just go
3    ahead and say it. It's all in [sic] the tip of your tongue. Just let it out
     Jon ... [W]as Rollie involved? Jonathan it's not that hard. Either he
4    was or wasn't. Com'mon, do it. Do it now. Either he was or he
     wasn't. Was he involved? Yes or no? Com'mon, com'mon! ...

5
     Detective Munley: Get it out ...
6
     Detective Sinsabaugh: I'm with you. I'm with you. You gotta help
7    me on this one. We gotta make this right Jonathan. This's no game
     Jonathan; I'm being honest with you.

8
     Detective Munley: He was involved, wasn't he Jon?
9
     Detective Sinsabaugh: It's your side of the story.
10
     Detective Munley: He was, wasn't he.
11
     Detective Sinsabaugh: Com'mon Jonathan.
12
     Detective Munley: Jonathan, look at me; he was, wasn't he? Go
13   ahead Jonathan.

14   . . . . .

15   Detective Sinsabaugh: You were involved Jonathan. You were
     involved.
16
     Detective Munley: We gotta know the extent of your involvement.
17   We gotta have your version Jon.

18   Detective Sinsabaugh: Man, you gotta get it out.

19   Detective Munley: Tell it, Jon.

20   Detective Riley: Jonathan can you honestly sit there and tell myself
     and Dave and Rick right now that you were not at that temple.
21
     Detective Sinsabaugh: No, 'cause Jonathan Doody doesn't lie.
22
     Detective Munley: Jonathan, can you?
23
     Detective Riley: Com'mon this is not that hard. You know what
24   we've talked about throughout this whole conversation. If you're
     there, we can deal with that; but we gotta know, we gotta hear it
25   from you. You have to tell us. Yes or no? Were you or weren't you?
     Yes or no? Jonathan, com'mon. Yes or no? Yes or no? Yes or no?
26   Yes or no? It's real simple. Were you or weren't you. Just tell me,
     yes or no. Com'mon yes or no, it's real simple.
27
     . . . . .
28

18

1   Detective Sinsabaugh: Join the team. Let's work this thing out
2   together. I'm not gonna tell you, you can't Jonathan. Let's straighten
    this shit up.

3   . . . . .

4   Doody: (Murmur)

5   ...

6   Detective Sinsabaugh: Jonathan do it.

7   Detective Riley: We have to know; you have to let us know. If you
    don't, let us know know [sic] body else is gonna do that for you.
8   Either you tell us you were or weren't, it's really simple. I know it's
    a struggle right now, but you have to let us know that. Whether or
9   not you were there. Simply yes or no. What is it, which one is it?
    Com'mon, take control right now.
10
    Detective Sinsabaugh: Answer Jonathan, answer.
11
    Detective Munley: You can do it Jon.
12
    ...
13
    Detective Munley: Jon, it's not the end of the world. It's not the end
14  of the world.

15  . . . . .

16  Jonathan you can do it.

17  Detective Riley: Please! Jonathan, com'mon. You can deal with
    this; you can take control of this situation. The way to start with
18  that is to do this now by telling us whether or not you were there.
    Were you or not there? Jonathan Please tell us now. Let us help you
19  ...

20  Detective Munley: Get it out ...

21  Detective Riley: Give us the opportunity.

22  Detective Munley: Get it out. Go ahead.

23  Detective Riley: Grab a hold of this opportunity. Let us help you.
    Like Rick's been telling you, trust us.
24
    Detective Sinsabaugh: Jonathan, Jonathan, Jonathan look at me.
25  This is flat out bull shit man. What what what what'd, you been
    brought up better than this. What the hell does this stand for, Okay?
26  Are you gonna cover for bunch [sic] of cowards. I'm trying to
    convince these people Jonathan that you didn't kill anybody. You
27  got something in here, and you you're sitting here playing a game
    and I'm not gonna put up with it. You're gonna sit there and cover
28  for bunch [sic] of cowards. I think Jonathan, I'd come to you

1   straight up and I'm gonna give [sic] chance to answer and I want
2   you to come clear with this. Don't cover for these guys. They're
    cowards, Jonathan. Tell me.

3   Doody: I can't.

4   Detective Sinsabaugh: Why? I'll work with you, why? Why
    Jonathan? Why? Talk to, I'd talk to you the other night Jonathan;
5   we can talk. Me and you can talk Jonathan ... don't freeze up on me
    man. You freeze up on me like this, I can't talk to you. Talk to me.
6   Why can't you and we'll work it out. Just sit down and discuss
    this.... Jonathan, take charge man. Your [sic] soldier man, you don't,
7   you you don't you can say what's on your mind and tell me
    Jonathan. Tell me. Tell me so I can work this out with you. Go
8   ahead my man, tell me. Tell me, trust me my man. Trust me. Trust
    me so we can work [sic] out; I need your help Jonathan. How did
9   you get involved in it and talk. How did you get involved in it?
    We'll work it out Jonathan, we'll work it out. I'm worried about
10  your family, too. We'll work it out. You need to help me Jonathan.
    Jonathan, Jonathan don't. You told me you can't, now why? Jon no,
11  Jonathan tell me. Why? Let's work it out together. Jonathan look at
    me my man, trust me on this. Let's work this thing. Why? If you
12  wanna say it Jonathan, why? Why? I I care about you Jonathan;
    you're [sic] family wanna know why ...

13  Id. at pp. 10–19.

14
    Between 3:15 a.m. and 3:56 a.m., after making a brief comment
15  about there not being a threat to his family, Doody Interrogation,
    Tape 9, p. 1, Doody again became silent. The detectives continued
16  without any response from Doody:

17  Detective Sinsabaugh: Jonathan, who did they threaten [sic] let it
    out? I know what's up Jonathan. Tell me about it lets [sic] work this
18  out. Jonathan I need your help to prove that your [sic] not a killer
    Jonathan. You went there it went to shit Jonathan it wasn't your
19  idea. You just got messed [sic] with the wrong guys, Jonathan look
    at me. Don't sst [sic], what's the problem? Jonathan tell me. Let it
20  out, who, you  said not me who? Who Jonathan? Jonathan be a man
    about this. Tell me.

21
    Detective Riley: Who's [sic] ideal [sic] was it Jonathan?
22
    Detective Sinsabaugh: Tell him Jonathan. Tell him Jonathan, who's
23  [sic] ideal [sic] it was. Let's get this out, there you go ...

24  Detective Sinsabaugh: Ideal [sic] was it?

25  Detective Munley: Go ahead Jonathan. It's easy, who's [sic] ideal
    [sic]? Let it out Jonathan. Go ahead.
26
    Detective Sinsabaugh: Jon, Jon, Jon trust me on this, Jonathan. It's
27  the only way we can work it out is if you're up front Jonathan. Now
    I talked to you tonight, the other time we talked you you you
28  intelligent [sic] help us on this talk to us.

Detective Munley: Who's [sic] idea was it Jonathan?

Detective Sinsabaugh: Jonathan I'm gonna have to leave the room are you gonna help me on this? Are you gonna trust me on this? You can't trust those guys. You can trust me now tell me Jonathan. Jonathan you're wasting time, now tell me. You want to tell us, so let's just tell it now.

Detective Munley: Tell Jonathan.

Detective Sinsabaugh: Jonathan, Jonathan who's [sic] ideal [sic] was it? Jonathan you just said it, who's [sic] ideal [sic] was it?

Detective Munley: OK Jonathan.

Detective Sinsabaugh: You're gonna cover for a cold blooded killer?

Detective Munley: Jon go ahead and let it out. Go ahead Jon.

Detective Sinsabaugh: Jon Jon Jon Jon are you gonna cover for a cold blooded killer, now let it out.

Detective Munley: Go ahead Jon. Get it out Jon. Were you there? Jon.

Detective Sinsabaugh: Jon Jon tell me so I know what we're up against. Why are you scared to tell us? Huh, Jon Jon you got to answer me why are you scared to tell us, answer me. No Jon why are you scared to tell us? I'm not gonna let you do this to yourself, why are you scared to tell us? No, Jon you're gonna answer me, why are you scared to tell us? I'm concerned about ya and I'm I'm gonna stay here until I get an answer, why are you scared to tell, let me help you on this Jon. Jon, why are you scared to tell us? Huh? Jon, Jon answer me. Why are you scared to tell us, I'm not gonna let you do this. Now you you start talking to me. Tell us Jon. Jon Jonathan tell us.

Detective Munley: Let it go. You just said it.

Detective Sinsabaugh: Trust me on this [Jonathan]. This is the only way.

Detective Munley: Go ahead Jon. Get it out Jon, just get it over with it has to come out. It has to come out, go ahead. Go ahead Jon.

Detective Sinsabaugh: Jon look what you're holding inside you want to tell us just tell us. Jon, Jon would you tell me? Look at me Jon, Jon don't look away, look at me Jon you're a soldier tell me what's up. Jon no no no tell me Jon talk to me Jon. Jon no no this guy it's not you're not gonna cut it that way man, you're gonna be a man about it. You're gonna talk to me Jon.

Detective Riley: Who are you afraid of Jon?

21

1   Detective Sinsabaugh: You you gonna get this out in the open now Jon that isn't going to buy it, you're you're you're an ROTC you're a
2   soldier now start talking to me Jon don't sit there like that talk to me. Jon you remember what's my name? What's my name? What's
3   my name Jon? What is my name? What is my name Jon?

4   Detective Riley: Don't you remember his name?

5   Detective Sinsabaugh: Do you remember me talking to you at school? I called you at school, your counselor and you called me?
6   Do you remember yes or no?

7   Doody: Yes.

8   Detective Sinsabaugh: OK, why is that so hard? Yeah I talked to him a couple of months maybe. Jon Jon do you want to talk or not?
9
   Doody: I'll pull up a chair.
10
   Detective Munley: Just get it out.
11
   Detective Sinsabaugh: Jon, excuse me. What's the deal are you
12   gonna talk to me or not? Who am I Jon? What's my name? Well talk, what is my name Jon? You can't remember it? You remember
13   me talking to you?

14   Doody: Yes.

15   Detective Sinsabaugh: OK speak up OK we're men now. Could you remember me talking to you?
16
   Doody: Yes.
17
   Detective Sinsabaugh: OK speak up, Jon. OK I'm talking you [sic]
18   straight up like a man, do you remember me talking to ya?

19   Doody: Yes.

20   Detective Sinsabaugh: OK I, you need to speak up through [sic] when you're talking to me. What is my name? You you remember
21   my name? Yes or no, do you remember my name?

22   Doody: Yeah.

23   Detective Sinsabaugh: OK, what's my name?

24   Doody: Richard Sinsabaugh.

25   Detective Sinsabaugh: Well why is that so hard? I'm I'm here for ya, you got to talk, why why you act [sic] that you don't talk like
26   that? Tell us these guys are trying to help you now what's up? Jonathan, that's it were [sic] talking now. Now, I know you're
27   involved Jonathan now now you gonna help me on this thing. So what's the deal, what don't don't start this stuff talk to me OK, lets
28   [sic] talk about the problem what problem are we having right now?

22

What's the problem? You say you're afraid of something, what are you afraid of?

Doody: I'm not afraid of anybody.

Detective Sinsabaugh: OK what's the problem talk to me that's what we need to talk about what's the problem? You're afraid of the family? Right?

Doody: No.

Detective Sinsabaugh: What? Talk to me that's what I need, so I can discuss it with ya what? Then what? Jon tell me, what?

Doody: I'm afraid for somebody.

. . . . .

Detective Sinsabaugh: Oh, are you afraid Vickie find [sic] out about you? What are you afraid of? I'm not a mind reader Jonathan you got to tell me, tell me. It's not that hard, tell me Jonathan seriously, tell me. OK? I talked to you Jonathan my God you're an intelligent guy, what's the deal tell me, you're afraid for Vickie what what are you afraid of Vickie for? What are you afraid of of for Vickie? Tell us so we can get over this hurdle this Vickie. Hurdle ... what's the problem? Jon Jonathan tell me what's the problem? Did you kill anyone there Jonathan? Look me in the eye yes or no, did you kill anyone there?

Doody: No.

Detective Sinsabaugh: I can't hear you Jonathan, did you kill anyone there takes [sic] a stand.

Doody: No.

Detective Sinsabaugh: OK, why is it that [sic] so hard to say is it because you might of, I don't think you killed anyone Jonathan, but I know you were there. Jonathan I'm gonna ask you this and don't give me information any doubts [sic] on it, cause I don't think you killed anyone, did you kill anyone at the Temple?

Doody: No.

Detective Sinsabaugh: Why is that hard to answer? You were there though Jonathan, right? Right? Jonathan, were you at the Temple? Jonathan, were, I'm asking you flat out, were you involved? Jonathan were you involved, don't lie to me yes or no? Tell me Jonathan, were you involved, I need to know so we can get over this and work on it. Were you involved? Tell me Jonathan. You were involved Jonathan, tell me. I know that but I need to know if you killed anybody, you said you didn't kill well how do I know if you're lying to me about this? Were you involved? Jonathan were you involved? Answer me, answer me Jonathan. Jonathan answer me. Answer me. What what's the problem answer me Jonathan

1

2

3

> what what are we going through all this, we want to work things out, what's the difference, we all [sic] ready know what's up Jonathan you're here, ya know we took you out of ROTC, this isn't a game OK you need you [sic] to help us out on this. And why you doing this, this doesn't look like a guy who wants to help us out, what's the problem? Were you involved?

4

5

> Interrogation Transcript, Tape 9, pp. 1–8. Doody finally responded, "Yes." Id. at 8.

6

7

8

9

10

11

12

13

> Over the course of several more hours of interrogation, Doody gave the detectives the "confession" they sought. Doody informed the detectives that Caratachea and Garcia approached him with a plan to conduct a war game with the goal of surrounding the temple without triggering the security system. Doody went to the temple with Caratachea, Garcia, and two others, George Gonzalez (Gonzalez) and his friend. Doody explained that he had no intention of entering the temple but, once past the security sensors, he followed the others inside. According to Doody, Caratachea, Garcia, Gonzalez, and the other participant ransacked the temple's living quarters and gathered the victims into the main room. After one of the monks recognized Gonzalez, Doody was ordered to go outside and confirm that the walls were sound-proof. Doody maintained that the shootings occurred while he was outside and that he did not know who fired the shots.

14   Doody v. Ryan, 649 F.3d at 994-999.

15      Although there are surely superficial similarities with the type of questioning in Doody

16 and that of petitioner's case, the interviews with petitioner herein were simply not of the same

17 pressure as exhibited in Doody's case.  First of all, the interviews in petitioner's case took place

18 over three days; it was not compressed into one marathon session.  Secondly, Doody's

19 interrogation was a tag team of three detectives giving Doody no respite from the pressure to "be

20 honest," "have honor," "let us help you" and the like.  Petitioner's interrogation was conducted

21 singly, albeit two detectives were involved.  Most importantly, Detective Jason, who did the

22 lion's share of the interrogation, was simply (persistently) getting petitioner to repeat her story

23 during the first two days of questioning.  Although the purpose of the repetition is clear, get

24 petitioner caught in inconsistencies, the type of pressure exhibited in Doody, a *relentless* -- we

25 need you to answer NOW-- was absent.  Certainly, some of that pressure was brought to bear on

26 petitioner, especially by Detective Tyndale after the polygraph, and by Detective Jason on the

27 third day of questioning, but simply not to the extent as set forth above.[9]

---

28 [9] The Court of Appeal, quoted above, has given examples of Detective Tyndale's questioning.

Moreover, petitioner's unsupported-in-degree by the record, "naivete" assertion is not the same as the "critical" factor of Doody's juvenile status, although the undersigned recognizes that

---

The undersigned gives a few more here which began to approach the questioning in <u>Doody</u>:

> Det. Tyndale [after *petitioner* had asked for some paper] Oh. Do you want to, uh, sit over here at the desk and try writing?
> Ms. Walker: No.  When I'm nervous (inaudible)
> Det. Tyndale: Oh, but you can write fine when you're nervous.
> Ms. Walker: Yeah.
>                                  ***
> Det. Tyndale: Do you want me to write it down for you?
> Ms. Walker: (No audible response)
>                                  ***
> Det. Tyndale: Okay, Whatever you want me to write.  Take your time.  How about if I start off with I'm sorry that I killed Tamaihia?
> Ms. Walker: (No audible response)
> Det. Tyndale: Or I was just so frustrated, but was an accident, and here's what happened. How about that?
> Ms. Walker: (No audible response)
> Okay. Okay.  So I was just so frustrated, but it was an accident, and here's what happened. And then what do I put next?
> (No audible response)
> Det. Tyndale:-- and laid back down.  But she wouldn't stop?
> Ms. Walker: (no audible response)

(CT 907-908.)

The questioning continued in this manner for quite some time, but petitioner, when she spoke, did not admit to wrongdoing.  On the third day of questioning, Detective Jason turned up the heat a bit:

> Det. Jason:  Let—let—let me tell you, Tamecka, are—yeah, Tamecka.
> Ms. Walker: Tamecka, uh-huh.
> Det. Jason: I think you—you've been honest, okay?  Um, yesterday was apparent—your mom, she…
>                                  ***
> But you need to be honest here today on what happened to Tamaihya, okay?

(CT 1213-1214.)

> Det. Jason: Tamecka—
> Ms. Walker:  You know? Uh-huh
> Det. Jason:  Tamecka, do me a favor here and just be honest with me, okay? (Unintelligible)  use (unintelligible) both of us, that's all I'm after you to be honest here, okay?  Something caused her to take her last breath, and it wasn't wrapping her in a blanket, okay?  Did you couple your hand over her face and her nose until she got—

…..

(CT 1222-1223.)

> Det. Jason: Tamecka, you do know, and you're almost there girl.
> Ms. Walker: No, I don't know.
> Det. Jason: Tamecka, you do know, okay?  I'm trying to be very polite with you, but I know you're not being truthful, okay?
> Ms. Walker:  (Unintelligible)—

(CT 1224-1225.)

25

1    Doody was almost an adult at the time of his interrogation.  Many persons who are interrogated

2    by the police are being questioned for the first time; these persons may not have developed a skill

3    set of "admission avoidance."  But something more than unfamiliarity with police techniques is

4    necessary before persistent questioning will be found to have overborne the will of the person

5    being questioned.  It appears to the undersigned that petitioner believed she could talk her way

6    out of her problems; many people make that mistake as the interrogators are politely weaving the

7    web ever tighter on the person questioned.  Good interrogation technique should not be confused

8    with undue pressure.  As recounted above, petitioner was permitted to go home after the first and

9    second day of questioning to recover and reflect on the day's interrogation.

10          Finally, the court in Doody found that the Miranda rights given were designed to impress

11   upon Doody that his constitutional rights were not all that important.  Petitioner concedes in her

12   reply that the letter of Miranda was observed, just that the "spirit" was violated.  Miranda

13   warnings, designed to be given or not on an objective bright line basis are all about the letter of

14   the law, and not its spirit, whatever that is.  Most importantly, petitioner's rights were conveyed

15   to her in a forthright, understandable manner without much commentary on the side.  See CT

16   476-477 [petitioner given her Miranda rights on Oct. 24 (third day) at the beginning of the

17   interview].  Petitioner had clearly *not* been in custody for Miranda purposes for the first two days

18   as she was permitted to go home those days.  If one is not in custody, and hence not given

19   Miranda rights, the letter *and* spirit of the Miranda decision have been observed.  Moreover, there

20   is nothing in the record to suggest that had petitioner been given her rights on the first day, she

21   would have invoked them, as she clearly did not on the third day after two days of tiresome

22   questioning.

23          Finally, petitioner's citation of Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004),

24   is inapposite.  The "dual" interrogation preclusion, i.e., questions purposefully asked before

25   Miranda rights were given followed by a post-Miranda recapitulation of admissions, was limited

26   to *custodial* interrogations.  If petitioner's observations applied to a non-custodial situation, police

27   would always be precluded from asking any questions regardless of custodial status prior to

28   giving Miranda rights.

1       In sum, the Court of Appeals' determination that petitioner's confession was not

2 involuntary cannot be termed unreasonable as that term is defined in AEDPA.

3       Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

4 issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A

5 certificate of appealability may issue only "if the applicant has made a substantial showing of the

6 denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth herein, a

7 substantial showing of the denial of a constitutional right has not been made in this case.

8 *Conclusion*

9       For the reasons set forth above, the petition is denied, and a certificate of appealability

10 will not issue.  The undersigned acknowledges that many 25 years to life sentences involve

11 circumstances more egregious than those here.  Generally, first degree murders involve an actual

12 intent to kill.  The circumstances here resemble manslaughter more than first degree murder.

13 However, petitioner's case is governed by the law in California which exacts very serious

14 punishment for the purposeful infliction of injury to a small child which results in death.

15 Dated:  January 29, 2014

16                        /s/ Gregory G. Hollows

17                      GREGORY G. HOLLOWS

18                UNITED STATES MAGISTRATE JUDGE